Kilty, Chancellor.
The motion to dissolve the injunction in this case, came on to be heard according to notice, and was argued by counsel for Manhardt, (the said counsel having also been made a defendant;) and by the complainant in proper person.
On considering the bill, answers and exhibits, I am of opinion, that the equity of the bill is not denied or destroyed; and that the defendant Manhardt is not entitled to a dissolution of this injunction. It is apparent from the answer of Manhardt, that he relies on the verdict, or his statement of the course, of law by which the sum due from the complainant was ascertained, for the amount thereof; which amount he was clearly mistaken in. His debt against Bryden was $6654, in 1818; making, with the interest, $9326 62. But Chase’s debt to Bryden could, at most, have been only $6000, with interest from 1812. And it was admitted in the argument, that there was a mistake of several hundred dollars by the jury’s finding a verdict for the sum due from Bryden, instead of the sum due from Chase as garnishee. Manhardt states his information and belief, that the verdict and judgment at law were obtained upon a full and fair trial upon competent evidence; and he denies, that he authorized his counsel to relinquish any part due on the verdict.
As to the first point, it appears from the answer of J. Purviance, Esq’r, to which no objection has been made, that the trial was not a full one, nor in the ordinary course where a serious opposition is intended; but that he permitted a verdict to be entered for what he supposed to be the balance of principal and interest; and not alleging, that he was regularly the counsel of the complainant, though he was of Bryden.
And as to the second point, J. Purviance states in his answer, that he was ready to wait on D. Hoffman, Esq’r, counsel for Manhardt, to correct any errors, and D. Hoffman states his belief, .that he informed the complainant the excess, if any in the verdict, would not be claimed; which, as counsel for Manhardt, he had a right to do. And it appears by his answer, that the verdict was rendered for the amount supposed to be due, to wit, $6654, principal, with interest from 1808, which were the sums due from Bryden *335 to Manhardt, and not the sum due from Chase to Bryden. This part of the answer is not a denial of the equity of the bill in that particular’.
It is true, that the present- complainant had it in his power to contest the suit more fully than he has done, and if he was concluded by his neglect, there would be an end of the case. ' But wherever there is an agreement to allow for payments or deductions, it furnishes a ground for the interference of a court of equity. And so where a verdict is entered by surprise or mistake, the latter of which is admitted in -this case. And the Court of Appeals has gone much further in relieving against the verdict of a jury, or the confession of judgment.
In noticing the answers of the counsel in the suit at law, I have to observe, that I am not satisfied hs to the necessity of making them parties to this suit; and if they were proper parties, they were not bound to answer beyond what related to themselves. But as to all the answers, in a motion to dissolvé an injunction, the fafcts set forth alone are to be considered as established thereby, and not the opinions or conclusions of‘ law drawn by the defendants from the facts; much less the~reasoning in them.
It is a ground of equity in the bill, that Chase was not bound to give his notes, or make payment of the $6000 to Bryden, until the previous conditions were complied with. The tender of value, &c. on behalf of Bryden, does not affect this equity, inasmuch as it was accompanied by a demand of the notes, which, after the attachment was laid, he had no right to demand. As to Manhardt himself, (independent of the verdict irregularly entered,) supposing the claim to have been such as could be attached, he had no right to be put in a better situation than Bryden, or to put Chase in a worse situation as to the debt, or as to the terms on which it was to be paid. If the injunction should now be dissolved, after deducting the excess in the verdict, as proposed by the counsel for Manhardt, the complainant might be left without remedy, if the instruments of writing, now Tiled, should be insufficient; which will be a question proper to be determined on final hearing. But the complainant claims also a deduction of the interest charged in the verdict; on which, though it was not considered as the ground for the injunction in the order passed, he has a right to a decision, as it is not admitted, but strongly contested.
This brings the case within the rule laid down in the suit by *336 Colegate against Lynch ;(a) that when a proper ground for the injunction is admitted by the answer, and there still remains a dispute between the parties, the injunction is universally continued. Here the admission is made by the answer of D. Hoffman, read and .relied on by himself as counsel for Manhardt, thereby removing the exception to it as evidence against Manhardt; and the mistake and overcharge was admitted by him in the argument, which would be within the same reason.
It is thereupon adjudged and ordered, that the injunction be and the same is hereby continued till final hearing or further order.
After this the defendant James Bryden died, and Charles F. Mayer, his administrator, was on the 1st of January, 1825, admitted as a defendant in his place, on an application in the manner prescribed by the act of 1820, ch. 161. After which the bill was amended by giving to it an additional prayer; and the commissions to take testimony having been returned, with the proofs taken, the case was by agreement set down for hearing and. brought before the court.
6th July, 1827. — Bland, Chancellor. — This case standing ready for hearing, and having been taken up at this time by consent, the parties were fully heard, and the proceedings read and considered.
The late Samuel Chase on the 26th of February, 1806, leased that property in the city of Baltimore, called the Fountain Inn, to James Bryden, for the term of fifteen years at the rent of $2000 per annum. And on the same day Chase gave to Bryden his bond, with a condition, that he, Chase, at the expiration of fifteen years from that day, and not before, and at any time within one year from the expiration of that term, and not afterwards, upon the payment to him, by Bryden, of the sum of $17,500, would convey in fee simple to Bryden that property. Bryden entered upon, and held the property accordingly. On the 11th of December, 1807, Bryden leased it to John H. Barney, at $3000 per annum for ten years from the first of April, 1808. Under this lease Barney entered and held as the lessee of Bryden, and sub-tenant of Chase. After which Samuel Chase the original lessor died; and the present complainant, and Richard M. Chase, it seems, became the holders of all the estate and interest in this property, which had belonged to the late Samuel Chase, but when or how does not appear.
*337 In this state of things, on the 26th of March, 1812, this complainant agreed to give James Bryden $12,000, for his interest in this property, the half of which he then paid to Bryden, and on the same day stipulated for the payment of the other half in these words: “ I agree that on James Bryderds delivering to me of the original bond of my late father Samuel Chase,. dated February 26th, 1806, duly assigned to Richard M. Chase, and also procuring Mrs. Margaret McIntosh of New York to assign and make over to the said Richard M. Chase a release of a mortgage given by the said James Bryden to her late husband; and also giving the said Richard M. Chase a good title to the lots and houses in ' the city of Baltimore, mentioned in the said bond, and also on his assigning to the said Richard M. Chase the original policies of insurance on the said houses: to give him good negotiable notes for the sum of $6,000 payable six months thereafter.” This is the contract referred to in the bill as exhibit A; that referred to as the receipt exhibit B, is not among the papers; and, as it was not noticed in the argument, it is presumed was considered wholly unimportant. It is not any where distinctly stated or shown from what time Barney was to be considered as the tenant of Chase; but it would seem, that it was from the first of April 1812, as Barney says he paid the whole of his rent to the end of his lease from that day to the complainant Samuel Chase.
In October, 1808, the State for the use of Christian L. Manhardt, one of these defendants, obtained a judgment in Baltimore County Court, against James Bryden, for the sum of $10,035 95, to be released on the payment of $5,018 82, with interest from the 1st of October 1803, and costs. Upon this judgment an attachment was issued, and returned to March term, 1809, laid in the hands of John H. Barney as garnishee, and at March term 1811, the sum of $1,002 40, was condemned in his hands, but without costs. This. attachment was renéwed and returned to October 1811, laid in the hands of John H. Barney, as garnishee, and judgment was rendered against him for $494, without costs, at March term, 1812. An attachment was then again immediately sued out on the same judgment; and, as it would seem, some time previous to the 17th of July following, was laid in the hands of the complainant Samuel Chase, and so returned to the ensuing September term. This case’ was afterwards continued, from term to term, until March 1817, when it was entered, " continued to await the decision in a cause in chancery.” And at the following Sep *338 tember term, on the plea of nul fiel record, judgment was rendered for the plaintiff; and an issue having been made up on the plea of nulla Iona, there was a verdict on it and judgment rendered for the plaintiff on the 13th of October 1817, against the garnishee Chase for the sum of $9326 62. Upon which judgment an appeal was prayed and'granted. And on the 29th of June, 1818, the judgment was affirmed by the Court of Appeals.
It appears, that the complainant Chase was consulted as to the nature of the papers and documents which he wished to obtain by his contract of the 26th of March, 1812; — that they were prepared and executed agreeably to instructions which he himself gave; and after the attachment had been laid in his hands, on the 17th of July, 1812, they were tendered to him; and offered to be delivered, upon his giving his notes for $6000, payable in six months thereafter; which notes he refused to give, because of the -attachment which had been laid in his hands as garnishee of Bryden; choosing rather to await its judicial termination. It was never proposed to deliver the papers on obtaining judgment on the attachment; nor did Chase ever offer to give or suffer judgment on receiving the papers; nor did he object in any manner to the sufficiency of the deeds, that had been tendered. Indeed, so far from it, on being expressly asked, if he had any objections to them, he replied he had none.
When the jury was sworn to try the issue on the plea of nulla bona, the papers, which Bryden had stipulated to deliver, were produced ; to show that he had complied with the contract on his part; and that, in consequence thereof, Chase had become his debtor for the sum of $6000, with interest thereon. And it being believed and supposed, by the attorneys, David Hoffman and John Purviance, (for they alone conducted the trial,) that the principal and interest of the debt due from Chase to Bryden amounted to $9326 62, the jury were permitted or directed to find a verdict for that sum; upon which a judgment was rendered.
Soon after this judgment was obtained, Chase complained to David Hoffman, the attorney for Manhardt, and also to John Purviance, that it had been obtained for much more than was really due, even if he were chargeable with interest; but that he ought not to have been, and could not lawfully be charged with interest at all, according to the terms of his contract. Upon which those attorneys both insisted, that he was chargeable with interest from the date of the purchase. But they agreed, that if it should appear *339 on a calculation and review of the proceedings, that he had been charged with too much, the excess should be. remitted. Indeed they admitted, that there was an excess which had occurred by mistake; which error should certainly be corrected. Chase did not then assert, that he owed nothing to Bryden.; or that, according to the terms of his contract, he could not, at that time, have been legally considered as the debtor of Bryden. It was not until some time after, that he objected to a judgment having been rendered, at that time, for either principal or interest, on the ground, that Bryden had failed to comply with the contract on his part.
It appears, that the policies of insurance had been regularly transferred by Bryden according'to the terms of the contract with Chase, on the 11th of April, 1812; and that the. papers alluded to in the contract of the 26th of March, 1812, were retained by John Purviance for some time, and are now filed in this case as exhibits referred to in the answer of David Hoffman.
These facts and circumstances have been collected from the bill, answers, exhibits and proofs; they are all that have any material bearing upon the matter now in controversy; other particulars will be noticed in the course of the investigation.
It does not appear, from any thing in these proceedings, what was the nature and extent of Richard M. Chase’s interest in the property called The Fountain Inn; but it is quite certain that the contract of the 26th of March, 1812, was made between this complainant Samuel Chase and James Bryden only; — that no other persons were immediately parties thereto. The complainant says in his bill, that he agreed with Bryden to purchase of him that property; and in the agreement itself he says, “ I agree that on James Bryden’s delivering to me,” See. Hence it is clear, that, although the assignment and releases were to be made to Richard M. Chase, yet when so made they were to be delivered to the complainant Samuel Chase, And further, that on Bryden’s delivering those papers to Chase he would give Bryden, " good negotiable notes for the sum of $6000, payable six months thereafter.” Whence it is perfectly clear, that the delivery of the specified papers was that. act to be done by Bryden, which was to bind Chase to him unconditionally as his debtor. Consequently, it was the contracting party Samuel Chase, aloné, who could insist.on the performance of it as a condition precedent. It was he alone who could dispense with it as a preliminary act, or waive it altogether. Does it then appear, that this act has been either performed, par *340 tially dispensed with, or altogether waived so as to make Chase the debtor of Bryden ; and when ?
From all the pleadings and proofs it is clear, that the complainant acquiesced in the fact, and acted upon the conviction of his having become legally and properly the debtor of Bryden in the sum of $6000 from the 17th of July 1812, when the papers were tendered to him. He was right in refusing to give his notes at that time, because of the attachment. It was not, however, the giving of his’ notes, which alone could fix him as the debtor of Bryden; but the delivery of the papers, or his dispensation with that delivery, either as a condition precedent or altogether. Chase did not reject the performance proffered to him by Bryden ; because it was partial, or at all defective in its nature. On the contrary, he expressly said he had no objections to make to it; and rested his non-compliance, on the pendency of the attachment; and nothing more. From the position he then assumed, it manifestly appears, that he waived the delivery of the papers as a condition precedent; and relied upon his contract alone, considering it as an independent agreement, by means of which he might obtain them. He might then have taken the ground, that the delivery was a condition precedent; or he might have offered to deposit the money in court on those papers being delivered t.o him; or he might have put that defence upon the record in the attachment case by a special plea, or in answer to the interrogatories propounded to him. But he did not do so. He must, therefore, be considered as the debtor of Bryden on the 17th of July, 1812, according to the terms of his contract. . .
Being perfectly satisfied of these facts, and that Samuel Chase did thus acknowledge and consider'himself as the debtor of Bryden on that day; it is unnecessary to determine whether this claim of Bryden’s was or was not such a debt as might have been attached in the hands of Chase as his garnishee; since Chase’s whole course of conduct in the attachment case amounts to a total and absolute waiver of every objection on that ground.(b)
The next question therefore is,' whether, according to the nature of the contract between Bryden and Chase he was chargeable with interest, and from what time? It has been insisted, that Chase ought to be charged with interest from the date of his contract, and *341 to sustain this position very great reliance has been placed upon a numerous class of cases, which show, that in equity a purchaser who takes, or has been let into possession and receives the rents and profits shall be charged with interest, (c) But none of those cases are like the one under consideration. Here it appears, that the lessor, Chase, purchased an outstanding claim from the lessee for which he paid $6000, down at that time, and stipulated to pay $6000 more, six months after the delivery -of certain papers relinquishing that claim. Shortly after which time he was let into the receipt of the additional rent from the sub-tenant. It appears, therefore, that he was let into that receipt, by reason of the first payment. And, consequently, the second payment cannot be affected in any manner whatever by that change; even supposing it not to have been within the contemplation and purview of that contract by which it was stipulated to be made. Hence this question about interest must rest altogether and exclusively upon that contract, and upon that alone.
By this contract Chase was to give his negotiable notes payable six months after the delivery of the papers. All negotiable notes carry interest from the day they fall due. To this general rule there are few if any exceptions. Had not the attachment been interposed, it is to be presumed that this contract would have been fulfilled by each of the parties exactly, according to its terms. If so, the papers would have been delivered to Chase on the 17th of July 1812, and he would have then given his negotiable notes payable six months thereafter, which would have borne interest when they fell due, and not before. The attachment did not alter Chase’s contract, or place him in any worse condition, than he would have stood before; it only commanded him to pay Manhardt instead of Bryden; and, although it obliged him to pay all, principal and interest, it could not compel him to pay sooner, or to pay more than he stipulated to pay Bryden. It is an established principle, that where goods are sold to be paid for by a bill of exchange, and the purchaser neglects to give the bill, the vendor is entitled to interest from the time the bill if given would have become due.(d) This covenant “to give good negotiable notes,” in effect then, amounts to an express stipulation to pay interest from the *342 day they would have become due iff they had been given. Consequently Chase must be charged with interest from the 17th of January 1813, the day when the notes would have become due had they been given as they should have been, -when the papers were tendered; and as it appears they would have been, but for the attachment; that is to say, from that day until the 13th of October 1817, when the judgment was rendered in the attachment case.
It thus appears sufficiently evident, that confining our consideration to the contract alone, Chase must be charged with interest. But it is said, that the attachment restrained him from paying the debt; and therefore, he cannot be burthened with interest during the continuance of that restriction. The legislature have declared, that a debt may be attached in the hands of a debtor before it is due.(e) And, consequently, in such cases, the plaintiff may obtain judgment before the debt becomes due with a stay of execution. (f) But they have said nothing about interest on any debt that may be attached. Whether the laying of an attachment of itself suspends the claim of interest upon the debt attached, is the question next to be investigated and determined.
All the other States of our Union have adopted a form of judicial procedure having the same object as the attachment of Maryland ; and hence we may with as much, perhaps more, propriety deduce illustrations and principles from their adjudications upon this subject than from those of England. In every instance, however, it is conceived that such adjudications, whether American or English, must be received with caution; because of the dissimilarity of the judicial forms, and the differences in many particulars of the code upon which they are predicated.
A decision of the Supreme Court of Pennsylvania has been much relied on, in which it is laid down as a general rule, in that State, that a garnishee is not liable for interest while he is restrained from the payment of his debt by the legal operation of a foreign attachment, (g) This same, tribunal has furnished us with an exposition of tire reason of this rule. Where the creditor, (it is said,) cannot enforce payment, nor the debtor pay consistently with the law, or without disobeying its positive and unqualified, injunctions, as by going into an enemy’s country to make payment, the debt shall not carry interest; because interest is paid for the use or for *343 bearance of money. Therefore, where a person is prevented by law, as in that instance, during the revolutionary war, from paying the principal, he shall not be compelled to pay interest during the continuance of the prohibition. And upon this analogy and these reasons, it is said, that the garnishee shall not be compelled to pay interest pending the attachment;(h) — unless he has been guilty of fraud or collusion, or has hiihself occasioned some unreasonable delay; which is in no case to be presumed, but must be proved, (i)
Nothing can appear to be more just and equitable than, that when a debtor is positively prohibited from, paying his creditor, or is prevented from doing so by the overruling calamity of war, he ought not to pay interest. Because in such case he is compelled against his will to become the holder or bailee of the money, at his own risk; and that too perhaps at a time and under circumstances when it may be very unsafe to use it, or utterly impossible to derive any benefit from the use of it. So far the reason is satisfactory, and applies as forcibly here as any where else.(j)
But in this State a garnishee, in an attachment case, is not thus absolutely tied up and restricted. He is ’ not bound to hold the money at his own risk and against his consent, or longer than he chooses, (k) Now it is upon this very principle, of the existence of such a positive restriction, that the rule of the Pennsylvania law is based. It is, that the restriction imposed by attachment is altogether analogous to -that prohibition imposed by a positive law, or a public war. This may be so there, but here it is otherwise.
I take it to be the established law of this State, that the defendant, in all actions founded on contract for the recovery of a debt, may have leave as a matter of course to bring the sum sued for into, court; and thus put a stop to the further accumulation of interest and costs, at least for so much as he brings in.(l) In those cases where the debt carries interest according to law, the mere bringing of an action for the recovery of it does not suspend the accumulation of interest for a single moment. Because it is the duty of the debtor to seek his creditor and make payment; and if he fails to do so he is liable to be sued, and is chargeable with *344 interest on the ground of his neglect. But if, being sued, he contests the claim, then he is chargeable on the stronger ground of his wilful opposition and denial of justice.
It is difficult to conceive what pretension a garnishee can have to stand in a better predicament than a defendant debtor. He is cited as a debtor; and is called into court certainly in that character, although not by that name and in that form. It is often said, that the object of our " attachment acts and practice,” is to enforce an appearance. It may with as much propriety be said, that their intention is to compel a plea or any entry upon the docket. Their true and only object is to enable a creditor to obtain satisfaction out of any property found in this State belonging to his absent or absconding debtor; and for that purpose they have provided “ a special auxiliary remedy for the recovery of debts :”(m) something analogous to which will be found to exist in every code whatever, (n) Hence it is evident, upon general principles, that a garnishee stands in all respects in a situation exactly similar to that of a defendant debtor; having the same rights and subject to the same liabilities. He may have leave, at any time, to bring the debt into court; and he is chargeable with interest from the time it becomes due until it is paid.
The positive provisions of our attachment act,(o) looks to and evidently sanctions this right or duty of the garnishee to bring the sum attached into court for the purpose of relieving himself from further responsibility and trouble. He may contest the claim made against him; but, if he does so, the act declares he shall be liable to costs ; — whence it clearly follows, that by assuming the position of a litigating debtor he would, as in all other similar cases, be also chargeable with interest upon the debt. A garnishee may not only defend his own interests, as a mere neutral in the controversy between the plaintiff and defendant; but he may also assume upon himself the character of an ally of the defendant. He is allowed to plead’and defend his rights .for him, and in his behalf.(p) But if he thus contests the plaintiff’s right to recover either as principal or ally in the controversy, the genius of our law, as well as the reason and justice of the case seem most strongly to require, that *345 He should be held answerable for the delay, and be charged with interests and costs.
In this case Chase pleaded, or suffered to be pleaded nul tiel record, and nulla bona. He thus opposed 'the plaintiff’s right to recover as principal and as ally in the controversy. He assumed the hostile attitude and position of a litigating debtor in every point of view. He comes now, therefore, with an ill grace into a court of equity to ask to be exempted from bearing the burthen of that loss which was the necessary and inevitable consequence of the position he had assumed. This same creditor had, just previously, to obtain satisfaction of this same debt, made a similar demand by attachment upon John II. Barney, who brought his debt into court and was thereupon dismissed without costs. Chase should have profited by the example.
But, it is said, that the attachment placed Chase in the condition of a mere stake-holder; and that a stake-holder is never charged with interest. Such, however, is not the case here, in point of fact. These patties have not consented, that Chase should stand here between them, and keep this money as a mere stake-holder; nor has the attaching creditor forced him to assume and continue in that position. Because, the court 'of justice, before which he was cited, was open and ready to relieve' him from that situation, whenever he thought proper to ask its protection. If without having had the money attached in his hands, it had been demanded of him by two or more persons, each of whom claimed a right thereto in opposition, to the other, he might have filed his bill of interpleader, and been relieved from the risk of paying it to either. But he could only ask for such relief on bringing the money into court; for equity will in no case even listen to any such cause of complaint, so long as the party holds the money in his own hands, (q)
Upon the whole then, it appears, that the rule laid down by the highest judicial authority of Pennsylvania upon this subject, is founded upon principles which have no existence in this State; and that the reasons of it are at variance 'with many of the well established principles of our law. Consequently, however just and beneficial the rule may be there, it cannot be considered as deserving the least regard in this State.
The case of Quynn v. West,(r) decided by the late General *346 Court of this State, it has been strongly urged sustains the position, that an attachment does not of itself in all cases stop the accumulation of interest during its pendency. On the other hand, it is contended, that this case as reported is obscure, contradictory, absurd, and cannot be law. Let us examine it.
The case is this. — Rutland, in October 1786, obtained a judgment against West, which “was to be released on payment of £849 9s. 8d., with interest from the 31 si of October 1786 till paid, and costs. Mason having obtained a judgment against Rutland, for £3234; on the 4th of August 1786, issued an attachment on his judgment which he laid in the hands of West on the said debt so by him due to Rutland; and on the second Tuesday of October 1788j Mason obtained a condemnation in the hands of West, of no more than the principal and costs mentioned in Rutland’s judgment, leaving the interest thereon, from the 31st of October 1786 to the day of the condemnation, untouched. Upon this state of things the only question was whether Rutland could recover the whole interest during that time; a part of which had accrued pending the attachment. Upon which the court gave judgment for the plaintiff.
Now it is said here is an apparent absurdity; — because Mason’s claim was large enough to cover the whole of Rutland’s judgment including principal, interest, and. costs ;t and yet Mason had only the principal and costs condemned, leaving the interest; that such a partial condemnation could not have been, because the law would not allow it. But there may be an attachment for part of a debt, which may be pleaded in bar pro tanto.(s) Why Mason attached only a part of this debt due upon Rutland’s judgment does not appear; but he might, and it appears did do so, and obtained a condemnation for the principal and costs only. And, consequently, the court appears to have correctly decided, that the attachment was a bar only pro tanto, to the amount covered by the condemnation, and no more.
It has been also urged, that after the recovery or payment of the principal, a creditor cannot-sue for and recover the interest. But if a creditor receives or recovers his principal debt in any manner so as not thereby either expressly or tacitly to relinquish his claim to the interest then due, he may as rightfully sue for and recover the interest then due, as if it were so much of the principal debt *347 itself -which he had suffered to remain in his debtor’s hands; for there is no more reason why the interest should not be recovered after the debt had been paid in a manner not to imply an abandonment of the interest; than that a party should not recover the mesne profits of land after he had obtained possession by means of an action of ejectment.(t)
Upon the whole then, although it may be admitted, that this case of Quynn v. West has not been so fully and perspicuously reported as it might have been; yet there is no just ground to charge it with absurdity, or to impeach the correctness of its principles in any way. By this decision it does most clearly appear to. have been held, that Mason’s attachment did not prevent the accumulation of interest upon Rutland’s judgment during its pendency. There are no reasons given for this or any other of the positions, which are necessarily involved in the judgment the court pronounced.
But as to the reason and propriety of a debt’s carrying interest during the pendency of an attachment, I entirely concur with what has been said by the Court of Appeals of Virginia. “ In all such cases,” it is said, “the safe and sound doctrine is, that if the party, though restrained from paying, holds and uses the money, (and we must presume he uses, if he continues to hold it,) he ought to pay interest; because the owner of the debt has a right to the interest; because money is worth its -interest; and if the holder does not think so, he has always the privilege of bringing the money into court; and because, if the debtor could under this restraining process, hold the debt for years, without interest, it would offer a strong temptation to him, to stir up claims of this kind, and to throw all possible obstacles in the way of a decision of the questions raised. ”(u)
I am, therefore, satisfied as well by reason and analogy, as by direct authority, that,an attachment has not the effect and operation of suspending any claim for interest, which exists independently of that judicial proceeding; and, consequently, that in this case Chase is properly chargeable with interest by virtue of his contract.
It has been urged, that Manhardt obtained a judgment against Bryden for more than he was entitled to. The court has not been *348 furnished with sufficient data to test the correctness of that judgment, even if it were now open to investigation. But it is stated in Manhardt’s answer, and was not denied by Bryden, who was fully and actively represented, when the judgment of condemnation was obtained in the attachment case; nor is it now denied by Bryden’s representative, who is a party to this suit, that Manhardt’s judgment against Bryden amounted at that time to $9326 62. This matter must therefore be now considered as finally and conclusively settled. Manhardt’s judgment against Bryden cannot now be questioned in any way; particularly by this complainant as garnishee; and in whose present bill there is no allegation which involves its validity and correctness. I therefore lay aside every thing that has been said upon that subject.
There can be no doubt, that this court may set aside a verdict that has been obtained by surprise or fraud, and grant a new trial. But, has there been any surprise or fraud in this case ? By the docket it appears, that there was an appearance entered for the garnishee; and, that two attorneys were noted in the usual manner as appearing in the defensive. It is certain, that one of them, John Purviance, had his name thus entered for the purpose of protecting the interests of Bryden, the defendant, and of Kyd, who were his clients. It is also certain, that he put in the pleas of nul tiel record, in defence of Bryden, and nulla bona in behalf of the complainant Chase ; and, that he had full, free and frequent conversations with Chase, the complainant, respecting the attachment while it was depending; who never once, in all that time, told him, that he, Chase, had any just grounds of defence for himself against the claim founded on his contract with Bryden. It is not distinctly shown for whom Luther Martin, the other attorney, appeared. But it is clear, that they were both willing, and either of them might have made for Chase any defence he might have instructed them to make. Indeed it appears, that interrogatories were propounded to him, as garnishee, which he answered; — and, consequently, that he not only had an opportunity to defend his interests in that cause, but was actually invited to spread his defence upon the record. Those interrogatories and answers are lost. The exceptions to the answers are, however, here; and among other things they say, that Chase did not file the original papers; and, that it did not .appear with sufficient certainty, whether the balance of the purchase money due to Bryden was due from him, (Samuel Chase,) or from the said Richard M. Chase. *349 Hence it is very evident, that neither the original, nor a copy of his contract of the 26th March, 1812, could have been filed with his answers ; and, that he certainly did not in those answers state, as a ground of defence, that he could not then be considered as the debtor of Bryden, according to the terms of that contract; because it had not then been performed by Bryden on his part.
The continuance at March, 1817, “ to- await the decision in a cause in chancery,” alluded to a suit which had been instituted by Manhardt against Bryden and others, and is still depending in this court, to obtain an injunction to prevent Chase from paying or giving his notes to Bryden for the sum of $6000, which had been attached in his hands; and also to obtain certain disclosures in aid of the attachment suit. But it does not appear, nor is it alleged, that it was founded on any special understanding or 'agreement with this complainant, or that he was, in any respect, misled by any confidence he placed in that entry as a continuing and binding agreement. On the contrary, he says, “ that he relied upon the said attachment’s being continued as the said injunction was then depending.” But he does not allege, nor does it in any way appear, that the continuance of the injunction involved, or embarrassed, or withheld from him any defence he might have made as garnishee in the attachment case, or that in consequence thereof he did not make any defence which he otherwise would have made. The fact is, that the injunction from this court, and the attachment at law, both operated upon Chase, the garnishee, in precisely the same way; the object of both was to prevent him from paying what he owed, to Bryden himself, and to have it paid into other hands. There is nothing which shows, that Chase was taken by surprise by any movement iii either of those cases, or by proceeding in either pending the other.
Much has been said about the-fraudulent and collusive conduct of Manhardt, Bryden, and Kyd. But it is not in any manner shewn how any of their alleged frauds or misrepresentations could or did affect the complainant Chase. It is admitted, that Bryden was indebted to Manhardt; and, that Chase was indebted to Bryden. Now, as the conduct of those persons did not in any way affect Chase, or charge him with more than he really owed Bryden, or enable Manhardt to recover more than he might lawfully claim of Chase as the creditor of Bryden, — it is exceedingly difficult to conceive how there could exist any fraud of which Chase could *350 have any just cause of complaint. Admitting every thing that has been said upon this subject to be true, it amounts to no more than this: — that Kyd and Bryden were disposed, if possible, to prevent Manhardt from having Chase’s debt applied in satisfaction of his claim, on the ground, that it was not liable to be so applied, or that Kyd had obtained a prior assignment or lien upon it, and that Manhardt compromised matters with them in order to enable him, without further delay, to obtain some satisfaction by means of the attachment laid in the hands of Chase. It is true, that equity will in some cases relieve a party from the consequences of a fraud, which has been practised upon a third person. As, if the fraud practised upon Manhardt alone had by any consequence or recoil injuriously rested upon the interests of Chase, he might have asked and obtained relief from this court. (v) But in this case, the squib aimed at Manhardt did not reach, or at all affect Chase; he, therefore, can have no cause of complaint whatever upon that ground.
In fine I am perfectly satisfied, that Manhardfs judgment against Bryden cannot now be impeached in any way; that in obtaining the verdict in the attachment case, Chase was not taken by surprise; and, that there has been no fraud practised upon him. But that there was a mistake in the judgment of condemnation obtained against him is absolutely certain. Indeed it is admitted, that to some extent a mistake had been made, which it was agreed should be corrected. The nature and extent of that mistake is now perfectly ascertained in the manner and upon the principles I have explained. Chase was accidentally ^ and erroneously represented as being indebted to Bryden to the full amount of Manhardfs judgment against Bryden, when in truth the fact was not so. This mistake must, therefore, be now corrected as was agreed. The staying of proceedings at law, upon the ground that judgment had been by mistake obtained for more than was really due, is quite a common case, — one which is often presented to this court. In such cases the verdict is never disturbed; or a new trial ordered. '
Charging Chase with interest from the 17th of January, 1813, when the debt became due, to the 13th of October, 1817, when the judgment of condemnation was rendered, it appears that the *351 whole amount then due from him to Bryden was $7706, and no more, leaving an excess of $1620 62. For the one amount, the judgment will be suffered to stand; — for the other, all further proceedings will be perpetually enjoined.
The bill prays, that the papers stipulated for by the contract of the 26th of March, 1812, may be now delivered to the complainant.
They have been brought in as exhibits referred to in the answer of the defendant David Hoffman ; no objection has been made to their sufficiency; I shall, therefore, order them to be delivered accordingly. The defendants Purviance and Hoffman having been improperly and unnecessarily made parties, I shall dismiss the bill altogether as to them.
Whereupon it is Decreed, that the judgment of condemnation, in the proceedings mentioned, obtained by Christian L. Manhardt against the complainant Samuel Chase, as garnishee of James Bryden, is hereby permitted to remain in full force and effect in all respects whatever to the amount of $7706; and, as to that amount the injunction heretofore granted is hereby dissolved; — That as to the sum of $1620 62, the residue of the judgment, the injunction is hereby made perpetual'That, the register make out and file in this case correct copies of all the original deeds referred to in the answer of the defendant David Hoffman; and deliver the original deeds unto the complainant at any time he may demand the same, as the deeds specified and required to be delivered to him by his said contract, in the proceedings mentioned, bearing date on the 26th of March, 1812; — And that the complainant’s bill of complaint as to the defendants John Purviance and David Hoffman, is hereby dismissed with costs.; — And that thé other defendants pay unto the complainant his full costs as against them to be taxed by the register.

 2 H. & J. 34.

 Louderman v. Wilson, 2 H. & J. 379.

 Sug. Vend. & Pur. 354; 1 Mad. Chan. 441.

 De Bernales v. Fuller, 2 Camp. 428, note; Porter v. Palsgrave, 2 Camp. 472; Boyce v. Warburton, 2 Camp. 480.

 1795, ch. 56, s. 6.

 Com. Dig. tit. Attachment, G.

 Fitzgerald v. Caldwell, 2 Dall. 215.

 Hoare v. Allen, 2 Dall. 102.

 Fitzgerald v. Caldwell, 2 Dall. 215.

 Dulany v. Wells, 3 H. & McH. 23; Court v. Vanbibber, 3 H. & McH. 144; Bordley v. Eden, 3 H. &. McH. 167.

 Ross v. Austin, 4 Hen. & Mun. 502.

 Tidd, Prac. 561.

 Burk v. McClain, 1 H. &. McH. 236; Campbell v. Morris, 3 H. & McH. 535; Davidson’s Lessee v. Beatty, 3 H. & McH. 594; Shivers v. Wilson, 5 H. & J. 130.

 Rex v. Wilkes, 4 Burr. 2549; Manro v. Almeida, 10 Wheat. 473; 2 Bro. Civil Law, 333.

 1715, ch. 40, s. 4.

 1795, ch. 56, s. 4; Wilson v. Starr, 1 H. & J. 491.

 1 Mad. Chan. 174; Spring v. S. C. Ins. Company, 8 Wheat. 268.

 3 H. & McH. 124.

 Com. Dig. tit. Attachment, G. & H.

 Creuze v. Hunter, 2 Ves. jun. 162; Snowden v. Thomas, 4 H. & J. 337; Dixon v. Parkes, 1 Esp. Rep. 110; Tillotson v. Preston, 3 John. Rep. 229; Johnston v. Brannan, 5 John. Rep. 268.

 Templeman v. Fauntleroy, 3 Rand. 447; Tazewell v. Barrett, 4 Hen. & Mun. 259; Hunter v. Spotswood, 1 Wash. 145.

 Clifford v. Brooke, 13 Ves. 132; Chesterfield v. Janssen, 2 Ves. 156; Garretson v. Cole, 1 H. & J. 374.